**RECORD NO. 15-6382**

In The

# United States Court Of Appeals
# For The Fourth Circuit

**ADRIAN F. KING, JR.,**

*Plaintiff – Appellant,*

**v.**

**JIM RUBENSTEIN, Commissioner; MARVIN C. PLUMLEY, Warden;**
**DIANNE R. MILLER, Associate Warden Programs/Housing;**
**SERGEANT GROVER ROSENCRANCE, Deputy Warden;**
**LESTER THOMPSON, Unit Manager E-1 Segregation; SHERRI DAVIS,**
**Unit Manager E-2 Segregation; STACY SCOTT, Supervised Psychologist/Ad**
**Seg Board; MIKE SMITH, SR., Unit Manager Ad Seg Board;**
**SAMANTHA GSELL, Case Manager Ad Seg Board; ADAM SMITH,**
**Unit Manager/Ad Seg Board Chairman; CLIFF GOODIN,**
**Head Psychologist, in their official and personal capacities,**

*Defendants – Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT MARTINSBURG

————————

**BRIEF OF APPELLEES**

————————

**Natalie C. Schaefer (WVSB 9103)**
**Kimberly M. Bandy (WVSB 10081)**
**SHUMAN, MCCUSKEY & SLICER, PLLC**
**1411 Virginia Street, East, Suite 200**
**Charleston, WV 25301**
**(304) 345-1400**

*Counsel for Appellees*
  *Jim Rubenstein, Marvin C. Plumley, Dianne R. Miller,*
  *Grover Rosencrance, Lester Thompson, Sherri Davis, Mike Smith, Sr.,*
  *Samantha Gsell, and Adam Smith*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____      Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO

2.      Does party/amicus have any parent corporations?      YES      NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?      YES      NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?      YES      NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)      YES      NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?      YES      NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _____      Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE

**************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____                          _____
        (signature)                                                              (date)

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...................................................................iv

ISSUES PRESENTED..........................................................................1

STATEMENT OF THE CASE.................................................................1

SUMMARY OF THE ARGUMENT ........................................................6

ARGUMENT .......................................................................................8

    OVERVIEW ..................................................................................8

    (1)   THE DISTRICT COURT PROPERLY DISMISSED MR. KING'S FOURTH AMENDMENT CLAIM ....................................13

         A.   The District Court Found That Mr. King Retained a Legitimate Expectation of Privacy In His Person, But that Expectation is Limited Commensurate With His Status as a Prisoner.................................................................................13

         B.   Application of the *Bell* Factors Supports the District Court's Conclusion that the Penile Implant Removal Was Reasonable ..........................................................................15

    (2)   THE DISTRICT COURT PROPERLY DISMISSED MR. KING'S EIGHTH AMENDMENT CLAIM ....................................21

         A.   Mr. King's Allegations Do Not Satisfy the Objective Test.............................................................................................25

         B.   Mr. King's Allegations Do Not Satisfy the Subjective Test.............................................................................................28

         C.   The District Court Correctly Analyzed Mr. King's Allegations ...................................................................................29

(3)    THE DISTRICT COURT PROPERLY DISMISSED MR. KING'S FOURTEENTH AMENDMENT EQUAL PROTECTION CLAIM .....................................................29

    A.    Mr. King Does Not Allege That He Was a Member of a Protected Class ..........................................................30

    B.    Mr. King's Allegations Do Not Survive a Rational Basis Review....................................................................34

(4)    THE FOURTEENTH AMENDMENT DUE PROCESS CLAIM FAILS BECAUSE IT WAS NOT RAISED BELOW AND WOULD NEVERTHELESS FAIL ON THE MERITS ....................39

    A.    Mr. King Did Not Assert a Due Process Claim and, Thus, Should Not Be Considered by This Court ................................39

    B.    Any Due Process Claim Fails on Its Merits.............................41

(5)    THE DISTRICT COURT CORRECTLY DISMISSED MR. KING'S CLAIMS AGAINST MARVIN PLUMLEY, CLIFF GOODIN, STACY SCOTT, AND JIM RUBENSTEIN ...................44

    A.    The District Court Did Not Err In Dismissing Mr. King's Claims Against Marvin Plumley, Cliff Goodin, and Jim Rubenstein.....................................................44

    B.    The District Court Did Not Err In Dismissing Mr. King's Claims Against Stacy Scott.......................................47

(6)    MR. KING DID NOT FILE A MOTION FOR LEAVE TO AMEND THE COMPLAINT, AND, THEREFORE, THIS ISSUE SHOULD NOT BE CONSIDERED ON APPEAL...............47

(7)    THE CORRECTIONS STAFF DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON ALL CLAIMS BECAUSE THEY DID NOT VIOLATE ANY CLEARLY ESTABLISHED LAW .......................................................49

CONCLUSION .......................................................................55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**PAGE(S)**

## <u>Cases</u>:

*Agra, Gill & Duffus, Inc. v. Benson*,
     920 F.2d 1173 (4th Cir. 1990) ....................................................40

*Allgood v. Morris*,
     724 F.2d 1098 (4th Cir. 1984) ..............................................25, 26

*Ashcroft v. Iqbal,*
     556 U.S. 662, 129 U.S. 1937, 173 L. Ed. 2d 868 (2009) .................23, 27, 45

*Ashcroft v. al-Kidd*,
     563 U.S. 731, 131 S. Ct. 2074, 2083,
     179 L. Ed. 2d 1149 (2011)..................................................... 49-50

*Bell v. Wolfish*,
     441 U.S. 520, 99 S. Ct. 1861 (1979) ...........................................13, 14, 15, 16

*Bell Atl. Corp. v. Twombly*,
     550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ...........................45

*Block v. Rutherford*,
     468 U.S. 576, 104 S. Ct. 3227, 82 L. Ed. 2d 438 (1984) .............................20

*Brandon v. Holt*,
     469 U.S. 464, 105 S. Ct. 873, 83 L. Ed. 2d 878 (1985) ...............................49

*Braun v. Maynard*,
     652 F.3d 557 (4th Cir. 2011) .......................................................53

*Cantley v. W. Va. Reg'l. Jail and Corr. Facility Authority*,
     771 F.3d 201 (4th Cir. 2014) .......................................................49

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
     473 U.S. 432, 440, 105 S. Ct. 3249, 3254,
     87 L. Ed. 2d 313 (1985)..........................................................32, 33

*De'Lonta v. Angelone*,
　　330 F.3d 630 (4th Cir. 2003) .........................................................................25

*Edwards v. City of Goldsboro*,
　　178 F.3d 231 (4th Cir. 1999) .........................................................................50

*Ellis v. La-Pac. Corp.*,
　　699 F.3d 778 (4th Cir. 2012) .........................................................................49

*Farmer v. Brennan*,
　　511 U.S. 825, 114 S. Ct. 1970,
　　128 L. Ed. 2d 811 (1994)................................................................................28

*Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*,
　　132 S. Ct. 1510, 182 L. Ed. 2d 566 (2012)............................................*passim*

*Foster v. DeLuca*,
　　545 F.3d 582 (7th Cir. 2008) .........................................................................48

*Giarratano v. Johnson*,
　　521 F.3d 298 (4th Cir. 2008) ..................................................................33, 34

*Harlow v. Fitzgerald*,
　　457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) ............................52

*Holly Hill Farm*,
　　447 F.3d 258 (4th Cir. 2006) .........................................................................40

*Hudson v. Palmer*,
　　468 U.S. 517, 104 S. Ct. 3194,
　　82 L. Ed. 2d 393 (1984)............................................................13, 14, 19, 20

*Hunter v. Bryant*,
　　502 U.S. 224, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) ............................49

*Johnson v. Caudill*,
　　475 F.3d 645 (4th Cir. 2007) .........................................................................53

*Kentucky v. Graham*,
　　438 U.S. 159 (1985)........................................................................................45

*Leaphart v. Prison Health Servs., Inc.*,
No. 3:10-CV-1019, 2010 WL 5391315
(M.D. Pa. Nov. 22, 2010), *report and recommendation adopted*,
No. 3:10-CV-1019, 2010 WL 5391188
(M.D. Pa. Dec. 22, 2010).......................................................................43, 44

*Lefemine v. Wideman*,
672 F.3d 292 (4th Cir. 2012) ......................................................................50

*In re Long Term Admin. Segregation of*
*Inmates Designated as Five Percenters*,
174 F.3d 464 (4th Cir. 1999) ..................................................25, 26, 35, 37

*Mitchell v. Forsyth*,
472 U.S. 511, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985) ...........................49

*Morrison v. Garraghty*,
239 F.3d 648 (4th Cir. 2001) ......................................................................30

*Muth v. U. S.*,
1 F.3d 246 (4th Cir. 1993) ....................................................................21, 39

*O'Lone v. Estate of Shabazz*,
482 U.S. 342, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987) ...........................42

*Pearson v. Callahan*,
555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) ...........................53

*Pell v. Procunier*,
417 U.S. 817, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974) ..............................14

*Preast v. McGill*,
65 F. Supp. 2d 395, 65 F. Supp. 2d 395 (S.D. W.Va. 1999).......................45

*Randall v. United States*,
95 F.3d 339 (4th Cir. 1996) ........................................................................45

*Robinson v. Equifax Info. Servs., LLC*,
560 F.3d 235 (4th Cir. 2009) ......................................................................40

*S.P. v. City of Takoma Park, Md.,*
    134 F.3d 260 (4th Cir. 1998) ........................................................................53

*Sanchez v. Pereira-Castillo,*
    590 F.3d 31 (1st Cir. 2009)....................................................................*passim*

*Saucier v. Katz,*
    533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) ...........................50

*Scheuer v. Rhodes,*
    416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974) .................................52

*Shaw v. Stroud,*
    13 F.3d 791 (4th Cir. 1999) ..................................................................45, 46

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.,*
    490 F.3d 130 (2d Cir. 2007) ........................................................................40

*Shrader v. White,*
    761 F.2d 975 (4th Cir. 1985) .......................................................................25

*Smith v. Maryland,*
    442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979) ...............................14

*St. John v. Moore,*
    135 F.3d 770 (4th Cir. 1998) .......................................................................48

*Stewart v. Hall,*
    770 F.2d 1267 (4th Cir. 1985) .....................................................................40

*Strickler v. Waters,*
    989 F.2d 1375 (4th Cir. 1993) ..........................................................25, 25, 27

*Textor v. Board of Regents of Northern Illinois University,*
    711 F.2d 1387 (7th Cir. 1983) .....................................................................48

*Turner v. Safley,*
    482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987) .....................18, 41-42

*In re Under Seal,*
    749 F.3d 276 (4th Cir. 2014) .......................................................................40

*United States v. Dyess,*
    730 F.3d 354 (4th Cir. 2013), *cert. denied,*
    135 S. Ct. 47 (2014) ..................................................................... 39-40

*Washington v. Harper,*
    494 U.S. 210, 110 S. Ct. 1028 (1990) ................................................41, 42, 43

*West v. Murphy,*
    771 F.3d 209 (4th Cir. 2014) .......................................................49, 50, 52, 53

*Wheatley v. Wicomico Cnty., Md.,*
    390 F.3d 328 (4th Cir. 2004) ...............................................................40

*Wiley v. Doory,*
    14 F.3d 993 (4th Cir. 1994) .................................................................53

*Wilson v. Seiter,*
    501 U.S. 294 (1991)...........................................................................24

*Winston v. Lee,*
    470 U.S. 753, 105 S. Ct. 1611, 84 L. Ed. 2d 662 (1985) ...................9, 51, 52

*Wolff v. McDonnell,*
    418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974) ...............................14

*Wood v. Milyard,*
    ⸺ U.S. ⸺, 132 S. Ct. 1826, 182 L. Ed. 2d 733 (2012) ........................40

## <u>Constitutional Provisions:</u>

U. S. Constitution, Amendment IV...................................................*passim*

U.S. Constitution, Amendment VIII...................................................*passim*

U.S. Constitution, Amendment XIV...................................................*passim*

U.S. Constitution, Amendment XIV, § 1............................................30

**<u>Statutes</u>:**

42 U.S.C. § 1983 ..................................................................................................49

W. Va. Code §§ 25-1-5, 28-1-5, 28-3-10, 62-13-2, and 62-13-4 ...........................37

**<u>Other Authorities</u>:**

90 CSR 1 (1987) ..............................................................................................37, 38

Restatement (Second) of Torts § 892A (1979).........................................................9

## ISSUES PRESENTED

Mr. King is alleging violations of his rights under the Fourth, Eighth, and Fourteenth Amendments arising from the conditions of his confinement. The underlying basis for each claim is a theory that he was given the choice to undergo surgical removal of penile implants or remain in administrative segregation. The facts alleged in Mr. King's Complaint, as construed in the light most favorable to him, fail to state a claim upon which relief can be granted under any potential cause of action. In the alternative, the Corrections Staff Defendants are entitled to qualified immunity on all potential causes of action.

## STATEMENT OF THE CASE

On or about January 8, 2013, Adrian King (an inmate at Huttonsville Correctional Center) was called to the Control Booth. (JA 25). At that time, he was told by C.O. II Michael Mussi (a nonparty) that Mr. King had to report to the medical unit. (JA 25). Mr. King was sent to be medically examined "due to an inmate reporting that [King] and another inmate were implanting marbles in [their] penises." (JA 25; 145). When Mr. King arrived at the medical unit, he was examined by R.N. Dana (nonparty). (JA 25). Mr. King informed the nurse that the penile implants and penile tattoo were done several months before he was incarcerated. (JA 25). The nurse's examination allegedly verified that the marbles were not recently implanted and there was no sign of infection. (JA 25).

1

Mr. King was then escorted to the Segregation Unit and was informed that "the implants were not in [his] IMIS[1] File." (JA 25). He claims that the absence of any reference to his penile implants was an oversight by the booking officer.[2] *Id.* Mr. King asserts that he specifically advised the booking officer at Mt. Olive Correctional Center about his penile tattoo and implants. (JA 25). According to Mr. King, that officer failed to include his penile tattoo and implants in the database. (Id)

Mr. King subsequently received a Violation Report for a violation of Policy Directive 325.00 – 1.26: "Exposing Body Fluids/Tattooing/Piercing." (JA 26; 31). Critically, despite Mr. King's present claim that his penile implants were inserted prior to his incarceration, he admits that he pled "no contest" to the institutional charge. [Doc. 7 at 3]. He explains that he did so, "at the advice and promise of an Inmate Legal Representative, and not believing that there was any way he would be found 'GUILTY.'" [Doc. 7 at 3]. Mr. King was adjudicated guilty and was sentenced to 90 days loss of earned good-time credit, 60 days loss of privileges, and 60 days of punitive segregation. (JA 26; 31). During his weekly segregation committee review, it was noted that Mr. King "placed objects in his penis." (JA 73; 75; 77; 79; 81; 83; 85; 87).

---

[1] "IMIS" is the acronym for the West Virginia Division of Corrections' Inmate Management Information System.

[2] Although this and many other factual issues are in dispute, the facts as alleged by Mr. King must be taken as true for the purposes of this appeal, as it pertains to dismissal pursuant to Rule 12(b) of the Federal Rules of Civil Procedure.

Mr. King alleges that Sherri Davis, Segregation Unit Manager, had him sign a paper, and that "[s]he said it was consent papers to go to Ruby Memorial Medical Center to have a doctor examine the implants, and if necessary, have them removed." (JA 26). On January 31, 2013, Mr. King was taken to Ruby Memorial Hospital and told that the penile implants were not a medical concern and that he "could not be forced to have the surgery." (JA 31). Accordingly, Mr. King exercised his choice by refusing surgery at that time and was returned to prison without the surgery being performed. (JA 31). Thus, Mr. King was told that he would be placed on administrative segregation because he refused to remove the penile implants that were deemed to be contraband by the Corrections Staff Defendants. (JA 31; 91; 89).

On or about March 7, 2013, Mr. King appeared before the administrative segregation committee. (JA 26). Although Mr. King asserts that the committee recommended his return to general population which was overturned by the Warden (JA 26; 66), the documented recommendation produced by Mr. King does not support this contention. (JA 71).[3] In fact, the committee recommended

---

[3] Counsel for Mr. King argues that counsel for the Corrections Staff Defendants injected factual information into the record below. Rather, it was Mr. King who attached numerous documents in support of his Complaint in briefing below. In light of Mr. King's argument that the District Court should have permitted him to amend his Complaint, the Corrections Staff Defendants will address assertions made by Mr. King in his Complaint and in subsequent briefing to demonstrate the futility of such amendment.

continued punitive segregation which was overturned by the Warden to reflect only administrative segregation. (JA 71).   He was placed on administrative segregation on March 9, 2013. (JA 31).

While on segregation, the committee met routinely, continuing Mr. King's administrative segregation because "[s]ubject placed objects in his penis and has yet to get them removed."  (JA 73).

Mr. King consented to the surgery on June 19, 2013.  He states that he "gave in and let them take me back to Ruby Memorial and have the marbles removed." (JA 26).  On June 19, 2013, Mr. King was taken back to Ruby Memorial Hospital "practically against [his] will . . ." to undergo the subject surgery. (JA 31).  Mr. King was returned to the general population on June 28, 2013. (JA 88).  This change was due to the fact that the "[s]ubject had surgery performed to remove contraband items from his penis."  (JA 89).

On July 11, 2013, Mr. King filed a grievance requesting "to be compensated monetarily for the pain and suffering and physical scarring that has, and will, result from the surgery that I was forced to have on my private parts on June 19, 2013." (JA 31).   On July 15, 2013, Unit Manager Randy Shreve (nonparty) responded to the grievance, stating "it was determined that an unknown object that you had knowingly had implanted in your penis could have been an item deemed a threat to the security of the institution.  I do not have the authority to grant the grievance as

4

requested." (JA 32). This response was affirmed by the Warden on July 16, 2013, "[b]ecause of the uncertainty to security issues [] caused by [his] own volition and the removal of such was deemed necessary to restore security to the institution, and [he was] not entitled for any sort of compensation." (JA 30).

Mr. King asserts that other inmates "implanted foreign objects in their penises (Dominoes, Rocks, etc.), yet were not given a choice of Administrative Segregation or Surgery." (JA 112). According to Mr. King, these inmates "merely did their punitive segregation or Pre-detention segregation, and were returned to General Population." (JA 112, 149).

Mr. King also produced other affidavits in support of Mr. King's contention that he had the implants at the time he was booked. (JA 93-99). However, none of these affidavits can operate to "undo" Mr. King's choice to plead "no contest" to his institutional charge of implanting the objects while in prison, for which he was adjudicated guilty.[4]

---

[4] Mr. King's claims cannot reasonably be understood to include a challenge of the institutional hearing process or the finding of guilty by the hearing examiner. Mr. King makes no criticism of the process that he was afforded in this regard, but instead, appears to acknowledge that it was a product of his own choice to plead "no contest;" a choice that he blames on bad advice from another inmate. [Doc. 7 at 3]. However misguided the advice from another inmate may have been, or Mr. King's decision to follow that advice, it does not change the analysis of the reasonableness of the Corrections Staff Defendants' actions subsequent to the adjudication of guilt to the violation.

## SUMMARY OF THE ARGUMENT

All of Mr. King's claims are barred due to his voluntary consent to the surgical removal of the penile implants which were deemed contraband by the Corrections Staff Defendants.

Mr. King's Fourth Amendment claim was properly dismissed because Mr. King pled "no contest" and was found guilty of the institutional charge, the Corrections Staff Defendants acted reasonably under the circumstances (1) to protect the staff and others in the general population from civil disobedience in encouraging others to mutilate themselves; (2) because the precise contraband that was subcutaneously inserted into Mr. King's penis posed a security threat; and (3) because of the threat of future contraband subcutaneously inserted into inmates' bodies. The justification for the surgery outweighed any limited privacy right retained by Mr. King under these circumstances.

Moreover, the District Court properly dismissed Mr. King's Eighth Amendment claim because he failed to properly allege all the elements necessary to state a claim for an Eighth Amendment violation. Allegations that Mr. King was kept segregated until he consented to the contraband removal surgery fails to state a claim since requiring Mr. King to choose between continued lawful confinement or valid consent to surgery to remove known contraband was permissible. Mr. King's conclusory allegations that he was threatened by staff are

6

not entitled to the presumption of truth and do not make his claim of deliberate indifference plausible.

The District Court likewise properly dismissed Mr. King's Equal Protection claim despite liberally permitting Mr. King to submit additional materials to the Court for consideration. Mr. King's wholesale attempt to revise his Complaint on appeal in an effort to allege a discriminatory animus based on perceived sexual orientation should not be permitted. Mr. King's new theory is not consistent with the facts he alleged, which do not place him in a suspect class. Because there was a rational basis for the actions taken by the Corrections Staff Defendants under the circumstances as alleged by Mr. King, the Equal Protection claim fails.

Additionally, Mr. King did not assert a Due Process Fourteenth Amendment claim in his Complaint. Therefore, that claim should not be considered by this Court. If the Court considers this claim, it nevertheless fails as a matter of law because Mr. King failed to properly allege facts sufficient to state such a claim.

Finally, the Corrections Staff Defendants are entitled to qualified immunity based on the allegations of the Complaint because there is no "clearly established law" that prohibited the Corrections Staff Defendants' actions. For these reasons, as well as those set forth in detail below, this Court should affirm the District Court's dismissal of Mr. King's Complaint.

# ARGUMENT

## OVERVIEW

The United States Supreme Court recognizes that "[c]orrectional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1513, 182 L. Ed. 2d 566 (2012). Society, both inside and outside prison walls, is ever-evolving. Because of the introduction into society of purely recreational or aesthetic body modifications involving the placement of objects under the skin for non-medically related purposes, prison officials must now ensure that jails are not made less secure by reason of what prisoners may carry *inside their bodies*.[5]

Any civil rights retained by Mr. King in prison do not prevent corrections officials from addressing concerns of institutional security simply because an inmate chooses to place contraband beneath his own skin, rather than concealed contraband on the exterior of his body.[6]

---

[5] The implant procedures are distinguishable from medical procedures and thus, officials are justified in treating such body modifications with heightened caution, when compared with prosthetics, pacemakers, or plastic surgery.

[6] While Mr. King asserts that the presence of small marble penile implants are not a security threat, prison officials have a legitimate basis to designate all items that an inmate places under his own skin as potentially dangerous or illicit. For instance, if inmates were not prohibited from engaging in this type of behavior, inmates could conceivably subcutaneously insert any objects into their bodies, such as razor blades, picks, bobby pins, keys, or other items. The creation of "skin

In addition, Mr. King's consent to the surgery bars all of his constitutional claims. Mr. King's Fourth Amendment rights are not implicated because he consented to the surgery. "When conducted with the consent of the patient, surgery requiring general anesthesia is not necessarily demeaning or intrusive. In such a case, the surgeon is carrying out the patient's own will concerning the patient's body and the patient's right to privacy is therefore preserved." *Winston v. Lee*, 470 U.S. 753, 765, 105 S. Ct. 1611, 1619, 84 L. Ed. 2d 662 (1985). Similarly, a surgery performed with Mr. King's consent is incompatible with, and does not support, an Eighth or Fourteenth Amendment violation.

The Restatement Second of Torts provides that "one who effectively consents to conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or for harm resulting from it." Restatement (Second) of Torts § 892A (1979). Mr. King consented to the surgery on two separate occasions. Mr. King alleges that Sherri Davis had him sign a paper, and that "[s]he said it was consent papers to go to Ruby Memorial Medical Center to have a doctor examine the implants, and if necessary, have them removed." (JA 26). He was taken to the hospital, but then refused to have the surgery. *Id.* Based upon the

pockets" to conceal drugs, weapons, blades, handcuff keys, or other contraband would also pose a risk if prison officials were not permitted to ensure the staff and population are safe from those objects. It is the breadth of infinite possibilities that justifies relying on prison officials' judgment when assessing penological interests and security for the facility as recognized in *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1513, 182 L. Ed. 2d 566 (2012).

revocation of his consent, Mr. King returned to the prison without the surgery being performed. *Id.* No surgery was forced over his objection. Later, Mr. King decided to have the surgery as a means of being considered for release from administrative segregation and returned to the general population. *Id.*

Mr. King characterizes the choice with which he was faced as a "Hobson's Choice," arguing that in reality he had only one choice. To the contrary, Mr. King was given two meaningful options from which to choose. His own actions demonstrate that he was aware of his options and that his desire to forego surgery and remain in administrative segregation was respected by Corrections Staff Defendants for as long as Mr. King exercised that choice. At no time did the Corrections Staff Defendants direct medical personnel to perform a surgery. Instead, the Corrections Staff Defendants allowed Mr. King to make an informed decision whether or not to undergo surgery. Thus, the surgery itself cannot form a basis for any constitutional violation. The only condition that Mr. King alleges "forced" his consent was administrative segregation, which is not unconstitutional. Under the circumstances of this case, the segregation was reasonable and constitutionally permissible.

Mr. King alleges that absent the surgical removal, he had to remain in administrative segregation and that made his consent "forced." However, the lack of any alternative that Mr. King found to be desirable does not invalidate his

consent.  If that were the standard, many decisions made by prisoners would be considered "coerced" simply because they are in prison and their actions are subject to consequences.

These consequences were set in motion by Mr. King's voluntary "no contest" plea and guilty finding to the institutional violation for placing objects in his penis while in prison.  In light of the guilty finding to this Class I violation, the penological discretionary determination was made that Mr. King posed a security risk due to the presence of contraband in his body.  Mr. King was initially placed on punitive segregation as a result of the guilty finding.  While Mr. King's punitive segregation ended after 60 days, and punishment for the violation was concluded, this did not resolve the underlying security threat that Mr. King posed due to the contraband still present under his skin.  The security threat was ongoing as long as the contraband remained in Mr. King's body; therefore, Mr. King continued to be separated from the general population in administrative segregation.  Segregation or removal of the contraband were the two alternatives presented to Mr. King because they were the only alternatives reasonably available to resolve the security threat created by the presence of the contraband in Mr. King's body.  Indeed, Mr. King's own voluntary insertion of items into to his penis led to a "real-world" consequence which created a security threat in the prison environment that, by its very nature, had limited options for resolution.

11

Mr. King could have retained the penile implants, albeit within the confines of administrative segregation for security reasons. Mr. King had the option of remaining in segregation and continuing to challenge his placement. Instead, Mr. King chose the other reasonably available option, to have the contraband, and thereby the threat, removed. The facts alleged by Mr. King demonstrate that the Corrections Staff Defendants preserved any potential right Mr. King may have to be free from a compelled surgery. As a result, Mr. King is barred from asserting that the Corrections Staff Defendants violated his constitutional rights under the Fourth, Eighth, or Fourteenth Amendments.[7]

---

[7] The consent here is distinguishable from the consent of the prisoner in *Sanchez v. Pereira-Castillo,* 590 F.3d 31 (1st Cir. 2009). In *Sanchez,* the prisoner alleged that his consent contemplated that surgery would be performed only after an additional rectal examination was conducted by the surgeon. *Id.*, 590 F.3d at 46. Based upon the allegations that the surgeon did not perform a rectal examination as promised prior to performing an exploratory surgery of the prisoner's abdominal cavity, the First Circuit concluded that the prisoner sufficiently alleged that he did not consent to the procedure as it was conducted. *Id.* There was no such misunderstanding here. Mr. King specifically consented to the precise procedure that was performed. Additionally, the prisoner in *Sanchez* alleged that he was taken to a hospital, where, in the presence of an officer who insisted on the surgery, he signed the written consent form. The First Circuit found that under such conditions, the prisoner's allegation that he was intimidated into signing the consent was plausible. *Id.,* 590 F.3d at 46. Here, the Corrections Staff Defendants allowed Mr. King to make an informed decision, and indeed, exercised that choice multiple times, even refusing the surgery on one prior occasion. Unlike the allegations in *Sanchez*, there was no intimidation here because Mr. King's consent was obtained only after he had several months to weigh the option of removing the contraband against the alternative of administrative segregation.

**(1)** **THE DISTRICT COURT PROPERLY DISMISSED MR. KING'S FOURTH AMENDMENT CLAIM.**

**A.** **The District Court Found That Mr. King Retained a Legitimate Expectation of Privacy In His Person, But that Expectation is <u>Limited Commensurate With His Status as a Prisoner.</u>**

The Fourth Amendment provides that "the right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The District Court acknowledged that the Fourth Circuit has not squarely addressed whether inmates retain any right to privacy under the Fourth Amendment following *Hudson v. Palmer*, 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984), which held that prisoners do not retain a right of privacy in their prison cells. (JA 170). The District Court found that a majority of circuit courts have recognized, following *Hudson*, that prisoners retain an interest in their bodily privacy under *Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861 (1979). (JA 170). As a result, and seeing nothing in *Hudson* itself to the contrary, the District Court concluded that Mr. King retained a legitimate expectation of privacy in his person.

This Court need not reach the question of whether prisoners retain an interest in their bodily privacy post-*Hudson*, as the resolution of this question did not affect the outcome below.

Assuming inmates retain some interest in bodily privacy, any expectation of privacy retained by Mr. King is not equal to that of a non-prisoner. The Fourth Amendment's applicability to search or seizure depends upon whether the person

13

seeking its protection can claim a "justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." *Hudson v. Palmer*, 468 U.S. 517, 525, 104 S. Ct. 3194, 3199, 82 L. Ed. 2d 393 (1984) (quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 2580, 61 L. Ed. 2d 220 (1979)). It is "clear that imprisonment carries with it the circumscription or loss of many significant rights." *Hudson v. Palmer*, 468 U.S. 517, 524, 104 S. Ct. 3194, 3199, 82 L. Ed. 2d 393(1984); *citing Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.C t. 1861, 1877, 60 L. Ed. 2d 447 (1979). The United States Supreme Court recognizes that "[t]he curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of 'institutional needs and objectives' of prison facilities, chief among which is internal security." *Hudson v. Palmer*, 468 U.S. 517, 524, 104 S. Ct. 3194, 3199, 82 L.Ed.2d 393(1984); *citing Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S. Ct. 2963, 2974, 41 L. Ed. 2d 935 (1974), and *Pell v. Procunier,* 417 U.S. 817, 823, 94 S. Ct. 2800, 2804, 41 L. Ed. 2d 495 (1974). A prisoner's right to bodily privacy is one of the rights that is necessarily limited or curtailed upon incarceration.[8] *See, e.g., Sanchez v. Pereira-Castillo*, 590 F.3d 31, 42 (1st Cir. 2009).

---

[8] The cases contained in the District Court's survey of other federal circuit courts supporting its conclusion that prisoners retain an expectation of privacy in their person, recognized only "some" expectation or a "limited" expectation of privacy. (JA 170-171).

The extent to which a prisoner's expectation of privacy is limited depends on the extent of the competing State interest justifying the search. For Fourth Amendment purposes, "the need for the particular search" must be balanced against "the invasion of personal rights that the search entails." *Bell v. Wolfish* 441 U.S. at 559. The application of this balancing test is the crux of the dispute between Mr. King and the Corrections Staff Defendants.

**B.    Application of the *Bell* Factors Supports the District Court's Conclusion that the Penile Implant Removal Was Reasonable.**

In determining that visual body cavity searches are not unreasonable in certain circumstances, the Supreme Court of the United States developed a four-factor reasonableness test. *Bell v. Wolfish*, 441 U.S. 520, 558, 99 S. Ct. 1861, 1884, 60 L. Ed. 2d 447 (1979). Under the *Bell* test, when determining the reasonableness of a search under the Fourth Amendment, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559. In *Bell*, the Supreme Court recognized the specialized nature of the prison setting for purposes of the Fourth Amendment analysis, recognizing that "[a] detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Id.* Since *Bell* was decided, its four-factor test has been utilized to determine the reasonableness of searches in other contexts.

15

In dismissing Mr. King's Fourth Amendment claim, the District Court employed the *Bell* test in determining that the penile implant removal surgery was reasonable. Mr. King agrees that this test is the appropriate test, but disagrees with the conclusion reached by the District Court. Assuming a "search" was performed, the surgery was reasonable in the context of this case.

1.  *Scope of Intrusion*.  Although the surgery was conducted on a sensitive body part, it was performed by medical personnel, and was localized, precise, limited in scope, and the result of Mr. King's decision to insert marbles into his penis at the outset. (JA 177).

The scope of the surgery here is readily distinguishable from the exploratory surgery in *Sanchez v. Pereira-Castillo*, 590 F.3d 31 (1st Cir. 2009), which caused concern for the First Circuit. In *Sanchez*, the surgical exploration of the prisoner's abdominal cavity was conducted for the purpose of determining whether contraband was present, despite the fact that "several tests had indicated the absence of any such object." *Id.*, 590 F.3d at 44. In *Sanchez*, the First Circuit found that "additional, far less intrusive testing could easily have obviated any need for such grievous intrusion." *Id.*

By contrast, the procedure performed on Mr. King was not exploratory. The presence and location of the contraband had been *confirmed* by a visual inspection following reports that inmates were placing items in their penises. Mr. King admits

that he did, in fact, have marbles implanted into his penis.  The District Court found these circumstances dissimilar to those in *Sanchez*, explaining that, "unlike *Sanchez*, King neither alleges nor is it readily apparent that a measure other than surgery could have removed the marbles."  (JA 178).  Importantly, the surgery was performed after consent was provided by Mr. King.  This factor weighs in favor of finding the search reasonable.

2.     *Manner in Which Search Was Conducted*.  The manner in which the surgery was performed was reasonable inasmuch as it was performed in a private, sterile, medical hospital by a licensed medical doctor, with Mr. King's consent. Although Mr. King alleges that he has been left with scarring and experiences discomfort following the surgery, these are not allegations regarding the manner in which the surgery was performed.  There is no allegation that the surgery was done improperly or in an unreasonable manner.  This factor, therefore, weighs in favor of finding the search reasonable.

3.     *Justification for Initiation of Search*.  There is a clear and unequivocal legitimate interest in controlling contraband in the prison system.  Insertion of foreign objects into or under the skin of inmates unquestionably raises concern for many reasons, not the least of which is the health and security of the inmates.  The United States Supreme Court has cautioned that "[t]he difficulties of operating a detention center must not be underestimated by the courts."  *Florence v. Bd. of*

17

*Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1515, 182 L. Ed. 2d 566 (2012), *citing Turner v. Safley*, 482 U.S. 78, 84-85, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987).  Courts, which tend to be reactive, must defer to prison officials both to proactively identify new potential threats to institutional security and to devise solutions address them. "Maintaining safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Id*., 132 S. Ct. at 1515.  As the District Court correctly noted:  "Courts must take care 'not to impose [their] own judgments about the security needs of prison administrators.'" (JA 178, *quoting Sanchez*, 590 F.3d at 43 (*citing Turner v. Safley*, 482 U.S. 78, 89 (1987))).

The reasonableness of the Corrections Staff Defendants' actions must be viewed in light of the full context of the security threat posed by subcutaneous body implants in a prison setting, not solely in the context of Mr. King alone. Subcutaneous metal, glass, or other hard materials present a very clear security threat in a correctional facility.  One instance could provoke other inmates to perform implantations of contraband into their bodies and then claim that any attempt to remove the contraband would be an unlawful search. In fact, this concern has been realized because Mr. King's Complaint alleges that other inmates were inserting objects into their penises, demonstrating that the presence of Mr. King's penile implants is not an isolated occurrence.

The United States Supreme Court has stated that prison administrators have an obligation to take reasonable measures to guarantee safety within the prison community. *Hudson v. Palmer*, 468 U.S. 517, 527, 104 S. Ct. 3194, 3200, 82 L. Ed 2d 393 (1984). In order to meet this obligation, "[t]hey must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today." *Id.* Moreover, prison officials have the task of detecting and preventing the flow of illicit items "before the schemes materialize." *Id.* For this reason, the United States Supreme Court held that "society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security." *Hudson*, 468 U.S. at 528, 104 S. Ct. at 3201.

At the time *Hudson* was decided, the Supreme Court concluded that "[v]irtually the only place inmates can conceal weapons, drugs, and other contraband is in their cells." *Id.*, 468 U.S. at 527, 104 S. Ct. at 3200. As Mr. King's Complaint demonstrates, inmates have now devised an additional place to potentially conceal contraband: beneath their skin. Prison officials have not only the reasonable justification, but also the obligation, to anticipate the problems to institutional security that this category of body modifications may pose, and to prevent such threats before they materialize. As the United States Supreme Court has reiterated, "[i]n addressing this type of constitutional claim courts must defer to

the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1513-14, 182 L. Ed. 2d 566 (2012).

When it comes to matters of prison security, the United States Supreme Court finds "'many justifications' for imposing a general ban rather than trying to carve out exceptions" for individual inmates. *Id.*, 132 S. Ct. at 1516, *quoting Block v. Rutherford*, 468 U.S. 576, 587, 104 S. Ct. 3227, 82 L. Ed. 2d 438 (1984). The Supreme Court is aware that, in order to be effective, policies to deter the possession of contraband in prison must not have predictable exceptions. *Florence*, 132 S. Ct. at 1516. This is true because "[i]nmates would adapt to any pattern or loopholes they discovered in the search protocol and then undermine the security of the institution." *Id.*, 132 S. Ct. at 1517, *citing Hudson v. Palmer*, 468 U.S. 517, 529, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984). Prison officials are similarly not required to adopt protocols or exceptions that they deem to be "unworkable." *Id.*, 132 S. Ct. at 1520.

With respect to Mr. King in particular, the actions of the Corrections Staff Defendants were reasonable. Though Mr. King claims that he had the penile implants prior to his incarceration, at the time the removal surgery was conducted, Mr. King had been found guilty of an institutional violation and the objects

beneath his skin had been deemed to be both contraband and a threat to security. The subject removal took place after Mr. King's consent had been obtained.

The District Court appropriately deferred to the Corrections Staff Defendants' assessment that Mr. King's penile implants constituted contraband and threatened institutional security, and correctly concluded that the surgery was justified. This factor weighs in favor of finding the search reasonable.

4.    *Place the Search Was Conducted.*  The search was conducted at Ruby Memorial Hospital, a private healthcare facility. Mr. King concedes that this factor weighs in favor of finding the search reasonable.

Mr. King did not plead facts consistent with an unreasonable search in light of the prison's security interests.  Accordingly, the Complaint failed to successfully state a claim under the Fourth Amendment and, therefore, was properly dismissed.

## (2)    THE DISTRICT COURT PROPERLY DISMISSED MR. KING'S EIGHTH AMENDMENT CLAIM. [9]

Mr. King alleges that the Corrections Staff Defendants violated his rights to be protected against cruel and unusual punishment when they forced him to have

---

[9] The second issue presented by Mr. King, while raised in the Complaint (JA 15-17), was not the basis for the appeal as identified in the Informal Brief [Doc. 7 at 1-2].  Indeed, the only Eighth Amendment claim discussed in Mr. King's Informal Brief arose from the conditions in Administrative Segregation due to chemical exposure. [Doc. 7 at 1-2].  Notably, such conditions are not contained in the Complaint or in the Formal Brief. Due to the inconsistent briefing and allegations, the issue of conditions of administrative segregation should not be considered for the first time on appeal. *Muth v. U. S.*, 1 F.3d 246, 250 (4th Cir. 1993).

his penile implants removed. (JA 15). The manner in which they purportedly forced him to have surgery was by "mental torture" and "unlawful segregation." (JA 27).

Mr. King's Formal Brief alleges that he was threatened with transfer to a maximum security prison if he did not consent to the removal surgery. [Doc. 24 at 28]. However, this characterization is not accurate. What Mr. King's Complaint actually alleges is that "[a]ny time an inmate is placed in Segregation over six (6) months, they _MUST_ be moved to Mt. Olive." (JA 26). According to Mr. King's grievance, which is attached to his Motion for Initial Review of Complaint, Lester Thompson, Unit Manager, told him that if he did not have the removal surgery, he would be transferred to the "Quality of Life Program at Mount Olive Correctional Complex." (JA 31). Far from asserting that this was a threat, it appears from the totality of Mr. King's allegations that Mr. Thompson's statement to him merely confirmed what Mr. King has asserted to be applicable policy requiring transfer to Mount Olive after six months of segregation. This cannot be considered a threat under even the most liberal reading of the Complaint. Furthermore, Mr. King makes absolutely no allegation that any of the other named Corrections Staff Defendants made any statements regarding transfer to another facility.

Mr. King's Formal Brief alleges that he was threatened with limited parole eligibility if he did not consent to the removal surgery. [Doc. 24 at 28]. The only

support for this assertion is again Mr. King's grievance, which is attached to his Motion for Initial Review of Complaint.  (JA 31). This document states that Lester Thompson, Unit Manager at Huttonsville, told him that if he did not have the removal surgery, he would be transferred to Mount Olive and that Mr. Thompson would "recommend [Mr. King] not make parole." *Id.* However, Mr. King has not alleged when he may be eligible for parole.  When eligible, he has not alleged to what extent any recommendation from Mr. Thompson may actually affect his parole eligibility.  Furthermore, Mr. King makes absolutely no allegation that any of the other named Corrections Staff Defendants made any statements regarding his parole eligibility. (*See, e.g.*, JA 16 – bald allegation with no individuals or factual support identified).

Mr. King's Formal Brief alleges that he was threatened with physical violence if he did not consent to the removal surgery. [Doc. 24 at 28].  However, this bald allegation in the Complaint is not accompanied by any factual support to demonstrate its plausibility under the *Ashcroft v. Iqbal,* 556 U.S. 662, 129 U.S. 1937, 173 L. Ed. 2d 868 (2009) standard, and is therefore not entitled to the presumption of truth. (JA 18).   Mr. King does not specifically identify any individual that allegedly threatened him with physical violence, nor does he describe any such threat. His Complaint fails to even plausibly allege that such threats were made by each Corrections Staff Defendant, so the Court need not

determine whether any such threats would constitute an Eight Amendment violation.[10]

Finally, Mr. King alleges that the Corrections Staff Defendants forced him to have surgery by "threatening" him with administrative segregation until he discharged his sentence. (JA 15, 27).

As the District Court correctly noted, "to make out a prima facie case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993) (citation and quotation marks omitted). (JA 166). "[T]he first showing requires the court to determine whether the deprivation of the basic human need was objectively 'sufficiently serious,' and the second requires it to determine whether subjectively 'the officials act[ed] with a sufficiently culpable state of mind.'" *Id*. (*quoting Wilson v. Seiter*, 501 U.S. 294, 298 (1991)) (JA 167). To establish a serious deprivation, "evidence of a serious or significant physical or emotional injury resulting from the challenged conditions" must exist. *Strickler v. Waters*, 989 F.2d at 1380.

---

[10] Mr. King brought suit against eleven individuals, and must meet the pleading standard with respect to each individual on each separate claim.

### A.    Mr. King's Allegations Do Not Satisfy the Objective Test.

"Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003).   To constitute an extreme deprivation, a prisoner must allege either "a serious or significant physical or emotional injury resulting from the challenged conditions" or a "significant risk of such serious harm resulting from the prisoner's exposure to the challenged conditions.  *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993); *De'Lonta*, 330 F.3d at 634. This Court has held that "before pain of a constitutional magnitude can be said to exist, there must be evidence of a serious medical and emotional deterioration attributable to" the challenged condition of confinement. *Shrader v. White*, 761 F.2d 975, 979 (4th Cir. 1985).

The District Court correctly recognized that segregated confinement is not a *per se* violation of the Eighth Amendment. *Allgood v. Morris*, 724 F.2d 1098, 1101 (4th Cir. 1984); *see also In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 472 (4th Cir. 1999) ("[T]he isolation inherent in administrative segregation . . . is not itself constitutionally objectionable."). (JA 166). Indeed, in addressing the issue of segregation, this Court stated that:

> So long as the rules of prison management 'are necessary or reasonable concomitants of imprisonment,' . . . so long as the rules are not exercised 'in such a manner to constitute clear arbitrariness or caprice,' no constitutional rights are infringed.

*Allgood v. Morris*, 724 F.2d 1098, 1100 (4th Cir. 1984) (internal citations omitted).

Even more on point is the fact that this Court has addressed the issue of long-term administrative segregation:

> The inmates do not contend that the [facility] has failed or will fail to provide them with "adequate food, clothing, shelter, and medical care" or to protect them from harm. And the isolation inherent in administrative segregation or maximum custody is not itself constitutionally objectionable.
>
> . . . Moreover, the indefinite duration of the inmates' segregation does not render it unconstitutional. Appellants complain that they have already been confined in administrative segregation or maximum custody for over three years, and that they do not expect to be released in the foreseeable future.
>
> . . . Although the [inmates] claim that their segregation has caused them to become depressed, the only evidence submitted on this point were the affidavits of a few inmates asserting that the overall conditions of their confinement have placed them under "great stress" and caused them "great emotional and physical suffering." Depression and anxiety are unfortunate concomitants of incarceration; they do not, however, typically constitute the "extreme deprivations ... required to make out a conditions-of-confinement claim." A depressed mental state, without more, does not rise to the level of the "serious or significant physical or emotional injury" that must be shown to withstand summary judgment on an Eighth Amendment charge.

*In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471-72 (4th Cir. 1999) (internal citations omitted).

26

Thus, allegations that Mr. King was kept segregated until he consented to the contraband removal fails to state a claim since requiring Mr. King to choose between continued lawful confinement or valid consent to surgery to remove known contraband was permissible.

Mr. King's allegation that there was no valid security reason relating to the continued presence of the implants is a conclusory allegation that is not subject to the presumption of truth under the pleading standard set forth in *Ashcroft v. Iqbal,* 556 U.S. at 678 (2009). Applying *Ashcroft* this way is particularly appropriate where Mr. King is an inmate purporting to assert a definitive opinion regarding what does and does not pose a threat to security within a prison. Such conclusory allegations need not be presumed true for purposes of a Rule 12(b) motion or this appeal. Documents that Mr. King made part of the record below demonstrate that the implants were considered both contraband and a threat to institutional security. (JA 30, 89, 91). Additionally, Mr. King's continued confinement was reasonably related to the purpose for which the confinement was taking place, specifically, the continued presence of the contraband inside Mr. King's body.

The Complaint fails to allege a plausible "serious or significant physical or emotional injury" related to segregation. *See Strickler*, 989 F.2d at 1379. Mr. King makes no sufficient allegations of harm arising from the administrative segregation. Accordingly, the Complaint fails to state a plausible Eighth

Amendment claim arising from Mr. King's placement in segregation. Any alleged damages arising from the surgery itself are a product of Mr. King's decision to have the surgery in lieu of continued permissible segregation, and thus, do not support an Eighth Amendment violation.

### B.    Mr. King's Allegations Do Not Satisfy the Subjective Test.

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S. Ct. 1970, 1974, 128 L. Ed. 2d 811, 820 (1994) (additional citations omitted).  This standard for "deliberate indifference" requires actual, subjective consciousness of a risk.  *Id.*, 511 U.S. at 840, 114 S. Ct. at 1980, 128 L. Ed. 2d at 827.  For liability to attach, it is not enough to allege that conditions or circumstances "should have been" known to a particular prison official, but rather, evidence must be offered of the official's actual state of mind, specifically that the official was personally aware of a substantial risk of serious harm to an inmate. *Id.*, 511 U.S. at 835-47, 114 S. Ct. at 1977-84, 128 L. Ed. 2d at 824-32.

Mr. King's argument on this element fails, because it is based upon the alleged forced surgery, not Mr. King's placement in administrative segregation. As the District Court noted, while Mr. King may have an argument that the Corrections Staff Defendants played a role in either initially placing him in segregation or continuing his placement there, none of the Corrections Staff

Defendants directed that the surgery take place.  Instead, the surgery took place only after Mr. King elected to have it done in an effort to be released from segregation and returned to the general population.  The subjective state of mind for purposes of the Eighth Amendment is the placement in segregation, and not the surgery.  There are no allegations specifically identifying actual, subjective consciousness of a risk of serious harm to Mr. King on the part of the individual Corrections Staff Defendants sufficient to state an Eighth Amendment claim.

### C.    The District Court Correctly Analyzed Mr. King's Allegations.

The District Court correctly analyzed Mr. King's Eighth Amendment claim in the context of segregation, and not the surgery itself.  The surgery does not violate the Eighth Amendment where Mr. King elected to have it performed as an alternative to remaining in segregation which was constitutionally permissible.

## (3)    THE DISTRICT COURT PROPERLY DISMISSED MR. KING'S FOURTEENTH AMENDMENT EQUAL PROTECTION CLAIM.

In his Complaint, Mr. King alleged that he was treated differently than other inmates who had implants in their penises, as well as other modifications.  (JA 17).  Mr. King's Formal Brief characterizes his claim as a claim that he was treated differently than the other inmates because of the perception that he was homosexual.  This characterization, which is made for the first time in Mr. King's Formal Brief, is not consistent with the facts alleged by Mr. King.  This theory

should not be considered for the first time on appeal.[11]  Additionally, Mr. King's

actions in pleading no contest to the institutional violation and later consenting to

the surgery bar his claim.

### A.    Mr. King Does Not Allege That He Was a Member of a Protected Class.

The Equal Protection Clause of the Fourteenth Amendment provides that

"[n]o state shall . . . deny to any person within its jurisdiction the equal protection

of the laws."  U.S. Const. amend. XIV, § 1. "To succeed on an equal protection

claim, a plaintiff must first demonstrate that he has been treated differently from

others with whom he is similarly situated and that the unequal treatment was the

result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239

F.3d 648, 654 (4th Cir. 2001). If this showing is made, "the court proceeds to

determine whether the disparity in treatment can be justified under the requisite

level of scrutiny." *Id.* (additional citations omitted).

In his Complaint, Mr. King claims that he was treated differently from other

prisoners who similarly inserted objects in their penises. At no point in the case

below does Mr. King claim that the disparate treatment allegedly perpetrated by

Corrections Staff Defendants arose from discriminatory animus.  In Mr. King's

Formal Brief, he makes a wholesale attempt to modify his entire Complaint vis-à-

---

[11] Indeed, Mr. King's Complaint allegations involving sexual orientation only
involve homosexual comments to him *after* the surgery.

vis his Equal Protection claim. Such revisionist attempts should not be considered on appeal.  For the first time in this litigation, Mr. King attempts to describe the purported "discriminatory animus" as one of sexual orientation (or perceived sexual orientation). [Doc. 24 at 42]. However, there is absolutely no allegation contained in the Complaint that any of the Corrections Staff Defendants believed that Mr. King was a homosexual.

This argument is also blatantly inconsistent with the face of the Complaint's allegations. The Complaint alleges simply that Mr. King was more severely reprimanded than other inmates who likewise personally inserted objects into their penises. (JA 17).  Any remarks or comments that are directed to sexual orientation occurred *after* the surgery.   (JA 16-17).   There are no allegations that any discriminatory animus precipitated the alleged unequal treatment (*i.e.* Mr. King being "forced" to undergo surgery and others were not).

The very allegations asserted in Mr. King's Complaint belie this new theory under the Equal Protection clause. In his statement of claim below, Mr. King alleged that, following the removal surgery, Mr. King was ridiculed by staff regarding the penile marbles, and that unnamed correctional officers would make "Homosexual remarks" about his marbles. (JA 15). Mr. King states his own opinion, without any support, that the removal surgery "makes it appear that I was caught in some kind of sick Homosexual Act and had to have my marbles removed

because of the act." (JA 16). He does not attribute this belief to any of the Corrections Staff Defendants. He claims that, following the surgery, gay inmates approach him and ask him questions, making him uncomfortable. (JA 16-17). Mr. King never alleged that these homosexual remarks had anything to do with the alternatives that he was given with respect to placement in administrative segregation or removal surgery, nor does he allege that homosexual remarks by either staff or other inmates pre-dated the removal surgery.

Mr. King claims that the remarks made to him about his penile implants are the result of corrections staff "gossip[ing]" about him. (JA 16-17). Mr. King states, "I have never flaunted my implants and no one knew about them until staff intervened." (JA 17). Mr. King then directly contradicts this assertion by producing seven affidavits from other inmates who allegedly learned about Mr. King's implants from Mr. King himself, prior to the discovery of the implants by corrections staff. (JA 93-99). Mr. King's conflicting factual representations do not support his conclusion that knowledge of Mr. King's penile implants spread to other inmates only after corrections staff learned about them, nor, by extension, his argument that homosexual remarks made to him are causally connected to any actions by corrections staff.

The District Court correctly concluded that, generally, courts analyze equal protection claims under rational basis review. *City of Cleburne v. Cleburne Living*

32

*Ctr., Inc.*, 473 U.S. 432, 440, 105 S. Ct. 3249, 3254, 87 L. E. 2d 313 (1985) (citation omitted) (JA 168). Pursuant to a rational basis review, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* A classification in such a statute has "a strong presumption of validity." *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008). However, a heightened standard of review will be applied in cases involving the violation of a fundamental right or a suspect class, such as race or gender classifications. *Id.* The District Court correctly concluded that Mr. King has not alleged that he is a member of a suspect class, and that rational basis review applies to his claim. (JA 168).

Even when the District Court viewed the Complaint liberally, it correctly found that Mr. King "has not stated a plausible basis for finding the Defendants treated him differently from similarly situated individuals due to intentional discrimination." (JA 168). Mr. King's Complaint alleges that other inmates with penile implants or other modifications were not placed in segregation or told to remove their body modifications. Mr. King's Complaint simply does not "allege membership in a suspect class that sets him apart from these inmates or that the Defendants intentionally discriminated against him due to a particular suspect characteristic." (JA 168).

### B.    Mr. King's Allegations Do Not Survive a Rational Basis Review.

Because Mr. King has not alleged that he is a member of a suspect class, rational basis review applies, which cannot be overcome in this case.  It is Mr. King's "burden to negate every conceivable basis which might support" the alleged unequal treatment. *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (additional citation and quotation marks omitted).  On the other hand, the Corrections Staff Defendants have "no obligation to produce evidence to support the rationality of the [classification], which may be based on rational speculation unsupported by any evidence or empirical data." *Giarratano*, 521 F.3d at 303 (citation and quotation marks omitted). The actions of the Corrections Staff Defendants were rationally related to the state's interest in maintaining facility security and safety. Mr. King offers only conclusory allegations in an effort to negate this important interest.  Specifically, Mr. King alleges that there was neither a security interest nor a penological interest in removing the penile implants. (JA 16, 18).  The District Court correctly concluded that "[s]uch conclusory assertions are insufficient to overcome the presumption of rationality." (JA 169, *citing Giarratano*, 521 F.3d at 304 (finding "conclusory assertion" that excluding inmates from protections of a federal statute was "not rationally related to any legitimate government interest" was insufficient to state a plausible equal protection claim)). It is well established that prison security is a legitimate state

interest, and that courts defer to the judgment of prison officials in the context of security. *See, e.g., In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d at 469 ("The rationale for judicial deference is greatest when the maintenance of prison order is at stake."); *Morrison*, 239 F.3d at 655 ("[W]hile a prisoner does not forfeit his constitutional right to equal protection by the fact he has been convicted of a crime and imprisoned, prisoner claims under the equal protection clause . . . must still be analyzed in light of the special security and management concerns in the prison system."). The "law" in question in the instant matter is the alleged decision to keep Mr. King in administrative segregation until he had his implants removed. The District Court properly concluded that the Corrections Staff Defendants actions of "[p]lacing King in segregation unless he had the implants removed rationally furthered this interest as the presence of contraband in the general population could threaten facility security and safety." (JA 169).

When the allegations in Mr. King's Complaint are considered, they do not even sufficiently establish that any other inmates were similarly situated to Mr. King. Mr. King's Equal Protection claim is based on his allegations that other inmates were allowed to keep foreign objects in their penises, and he was not. (JA 112, 149). He also asserts that other inmates were released from segregation, when he was kept in administrative segregation. (JA 149). The Complaint fails to explain

how any prison regulations were applied unequally, because Mr. King does not explain the regulations or policies as applied to others. He briefly discusses the violation that he received, as well as his punishment under the policies, but not those of others prisoners. It is unclear if the other inmates were even punished for the same violations. Accordingly, the facts alleged do not support a conclusion that policies are being applied unequally.

Importantly, Mr. King alleges that Shane Marcum, one of the inmates that was allegedly treated differently from Mr. King, "just recently left" Huttonsville as of the filing of Mr. King's Complaint. (JA 17). Other inmates identified by Mr. King in later filings were either "paroled into Federal Custody" or "released without surgery." (JA 149). While he claims that a few inmates with penile implants are "still in WV D.O.C. Custody," he fails to provide additional facts as to the status of these inmates. *Id.* The fact that other inmates were transferred to other facilities or released from custody demonstrates that they were not similarly situated to Mr. King, who was neither transferred nor released from custody during the time relevant to his Complaint. Thus, there is an insufficient factual basis for Mr. King's allegation that he was treated differently from other similarly situated prisoners.

Based upon the allegations of the Complaint, there is no plausible basis to find that the Corrections Staff Defendants treated Mr. King differently due to

discrimination. "There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence." *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471 (4th Cir. 1999) (additional citations omitted).

The Corrections Staff Defendants' actions, as applied to Mr. King, were rationally related to a legitimate state interest, *i.e.* the security, health, and safety of the facility and its inmates, thereby defeating any Equal Protection claims based upon incidental results. The Complaint's allegations illustrate that the Corrections Staff Defendants followed the legislatively authorized policies and procedures as outlined in the West Virginia Division of Corrections Policy Directives Manual.

The West Virginia Code of State Rules incorporates the Policy Directives Manual by reference as a legislative rule. 90 CSR 1 (1987). The West Virginia Code provides authority for the legislative incorporation of the Policy Directives Manual in W. Va. Code §§ 25-1-5, 28-1-5, 28-3-10, 62-13-2, and 62-13-4. Mr. King admits that he was charged with a violation of Policy Directive 325.00 – 1.26 "Exposing Bodily Fluids/Tattooing/Piercing." [Doc. No. 1-2, p. 20]. The Policy Directive provides:

> ***Detention can allow for the removal and segregation of an inmate from general population*** for purposes including, but not limited to, allowing the responsible official to conduct an investigation into the circumstances of the incident(s), ensuring immediate control and supervision, protecting potential victims, ensuring witnesses against intimidation, and ***ensuring the maintaining of facility security and public safety.***

West Virginia Division of Corrections Policy Directives Manual, incorporated by 90 CSR 1 (emphasis added).

The violation with which Mr. King was charged was a Class I charge, punishable by 60 days of segregation and 60 days loss of privileges, the punishments that Mr. King recognizes he received. (JA 26, 31). Indeed, Mr. King admittedly pled "no contest" to the violation, and was subsequently found guilty. (Doc. 7 at 3). Mr. King argues on appeal that there were other alternatives to the removal surgery. Indeed, the Corrections Staff Defendants offered an alternative to Mr. King in the form of segregation from the general population. Given that the penile implants were considered contraband and a threat to security, no other reasonable alternatives were available that could adequately address the security concerns implicated as long as the contraband remained in Mr. King's body. Similarly, accommodating Mr. King's alleged "right" to retain the marbles could significantly adversely impact prison security if he was permitted to return to the general population. In an effort to neutralize this threat, Mr. King was placed in segregation.

The decision to place Mr. King in administrative segregation was clearly "rationally related" to the Division of Corrections' legitimate interest in maintaining facility security and public safety. To approach this situation otherwise is to render the Policy Directives in place in West Virginia prisons entirely ineffective. Accordingly, Mr. King's claims for relief under the Equal Protection Clause of the Fourteenth Amendment should be dismissed for failure to state a claim upon which relief can be granted.

**(4) THE FOURTEENTH AMENDMENT DUE PROCESS CLAIM FAILS BECAUSE IT WAS NOT RAISED BELOW AND WOULD NEVERTHELESS FAIL ON THE MERITS.**

Mr. King's Due Process Fourteenth Amendment claim fails as a matter of law for several reasons: (A) this claim was not raised below and should not be considered on appeal; and (B) the Due Process claim fails on its merits. Moreover, as explained in detail *supra*, such claims fail because Mr. King consented to the surgery and the Corrections Staff Defendants are entitled to qualified immunity.

### A. Mr. King Did Not Assert A Due Process Claim And, Thus, This Claim Should Not Be Considered by This Court.

Because this claim was not raised to, nor decided by, the District Court, this Court should refuse to consider it. *See Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993) ("As this court has repeatedly held, issues raised for the first time on appeal generally will not be considered." (citations omitted)); *see also United States v. Dyess*, 730 F.3d 354, 365 (4th Cir. 2013) *cert. denied*, 135 S. Ct. 47

(2014). This Court sparingly exercises its discretion to address issues that are raised for the first time on appeal. Indeed, "[a]bsent exceptional circumstances, . . . we do not consider issues raised for the first time on appeal." *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 242 (4th Cir. 2009); *see also Agra, Gill & Duffus, Inc. v. Benson*, 920 F.2d 1173, 1176 (4th Cir. 1990). To raise an issue for the first time on appeal, a party must establish "fundamental error" or a denial of fundamental justice. *Stewart v. Hall*, 770 F.2d 1267, 1271 (4th Cir. 1985). "Fundamental error" is "more limited" than the "plain error" standard that applies in criminal cases. *Id.*; *accord Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 142 (2d Cir. 2007).

These rules are not intended "to trap unwary litigants, but to advance several important and 'obvious' purposes." *Wheatley v. Wicomico Cnty., Md.*, 390 F.3d 328, 335 (4th Cir. 2004). These considerations include "respect for the [integrity of the] lower court, [avoid] unfair surprise to the other party, and [acknowledge] the need for finality in litigation and conservation of judicial resources." *Holly Hill Farm*, 447 F.3d 258, 267 (4th Cir. 2006)(citations omitted); *In re Under Seal*, 749 F.3d 276, 285-86 (4th Cir. 2014); *See, e.g., Wood v. Milyard*, —— U.S. ——, 132 S. Ct. 1826, 1834, 182 L. Ed. 2d 733 (2012) ("Due regard for the trial court's processes and time investment is also a consideration appellate courts should not overlook.").

Admittedly, "King does not style this as a violation of his due process rights under the Fourteenth Amendment, . . ." [Doc. 24 at 49].[12]    Because the Due Process claim was not asserted below; Mr. King failed to object to the District Court's characterization of his claims below[13]; and failed to include a Due Process claim in his appeal, this Court should not consider this claim.

### B.    Any Due Process Claim Fails on Its Merits.

For the first time on appeal, Mr. King asserts a Due Process claim for a violation of his right to refuse "unwanted medical treatment."  Should the Court consider this claim, it nevertheless fails on its merits.

Prison officials may require a prisoner to undergo unwanted treatment when that treatment is "reasonably related to legitimate penological interests." *Washington v. Harper*, 494 U.S. 210, 110 S. Ct. 1028 (1990).  The legitimacy, and the necessity, of considering the State's interests in prison safety and security are "well established." *Washington v. Harper*, 494 U.S. 210, 223, 110 S. Ct. 1028, 1037, 108 L. Ed. 2d 178 (1990)(*citing Turner v. Safley*, 482 U.S. 78, 107 S. Ct.

---

[12] With respect to Mr. King's original claim that he was improperly denied an attorney in violation of the Fourteenth Amendment, he abandons this theory in his Formal Brief.

[13] Indeed, the District Court noted that "King claims that the surgery violated the Eighth Amendment's protection against cruel and unusual punishment, the Fourteenth Amendment's right to equal protection, and the Fourth Amendment's right to be free from illegal searches and seizures.  [Neither party objects to the R&R's characterization of the Plaintiff's claims.  As such, the Court reviews that portion of the R&R for clear and finds none.]" (JA 159).

2254, 96 L. Ed. 2d 64 (1987), and *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987) ("The proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is "reasonably related to legitimate penological interests."). This is true even when the constitutional right claimed to have been infringed is fundamental. *Id*. Thus, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Washington v. Harper*, 494 U.S. 210, 224, 110 S. Ct. 1028, 1038, 108 L. Ed. 2d 178 (1990).

The factors to determine the reasonableness of a challenged prison regulation are: (1) a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (3) the absence of ready alternatives is evidence of the reasonableness of a prison regulation. *Washington v. Harper*, 494 U.S. 210, 224-25, 110 S. Ct. 1028, 1038, 108 L. Ed. 2d 178 (1990).

The *Washington* Court made it clear that "[t]here are few cases in which the State's interest in combating the danger posed by a person to both himself and others is greater than in a prison environment, which, 'by definition,' is made up of

persons with 'a demonstrated proclivity for antisocial criminal, and often violent, conduct.'" *Washington v. Harper*, 494 U.S. 210, 225, 110 S. Ct. 1028, 1038-39, 108 L. Ed. 2d 178 (1990)(citations omitted).   A Court must "confront [] the State's obligations, not just its interests.   The State has undertaken the obligation to provide prisoners with medical treatment consistent not only with their own medical interests, but also with the needs of the institution." *Id*. (citations omitted).

The State has a legitimate interest in protecting the facility and its population from contraband.   Mr. King's choice between administrative segregation and surgical removal of penile implants was a rational means to achieve that interest. The case relied upon by Mr. King is a distortion of the standard relied upon in *Leaphart v. Prison Health Servs., Inc*. No. 3:10-CV-1019, 2010 WL 5391315, at *1 (M.D. Pa. Nov. 22, 2010), *report and recommendation adopted,* No. 3:10-CV-1019, 2010 WL 5391188 (M.D. Pa. Dec. 22, 2010).   Prisoners' interests have been deemed comparable to those of involuntarily committed mental health patients. Indeed, the *Leaphart* Court ultimately dismissed the case at the summary judgment stage, stating:

> We hold that convicted prisoners, like involuntarily committed mental patients, retain a limited right to refuse treatment and a related right to be informed of the proposed treatment and viable alternatives. *The scope of the right to refuse treatment, however, must be circumscribed by legitimate countervailing State interests.* Given the similarity of the State's interests in the administration of mental hospitals and prisons, the limitation on a prisoner's right of refusal should be similar to the limitation on the right of an involuntarily committed mental patient.

43

> Accordingly, *a prison may compel a prisoner to accept treatment when prison officials, in the exercise of professional judgment, deem it necessary to carry out valid medical or penological objectives*.

*Leaphart v. Prison Health Servs., Inc.*, No. 3:10-CV-1019, 2011 WL 2461955, at *9 (M.D. Pa. Apr. 28, 2011) report and recommendation adopted, No. 3:10-CV-1019, 2011 WL 2460958 (M.D. Pa. June 17, 2011)(emphasis added).[14]

Finally, reasonable alternative accommodations were available to Mr. King. Rather than continue in segregation, Mr. King exercised his choice in electing to undergo surgical removal of the penile implants. This is not the proverbial "Hobson's Choice;" rather, a consequence Mr. King faced due to committing a Class I violation and the continued presence of contraband in his body. The circumstances alleged do not rise to the level of a Due Process violation, and therefore, such claim fails as a matter of law on its merits.

**(5)    THE DISTRICT COURT CORRECTLY DISMISSED MR. KING'S CLAIMS AGAINST MARVIN PLUMLEY, CLIFF GOODIN, STACY SCOTT, AND JIM RUBENSTEIN.**

### A.    The District Court Did Not Err In Dismissing Mr. King's Claims Against Marvin Plumley, Cliff Goodin, and Jim Rubenstein.

A claim has facial plausibility only when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

---

[14] Furthermore, the *Leaphart* Court found that the Defendants were entitled to qualified immunity. *Leaphart v. Prison Health Servs., Inc*., No. 3:10-CV-1019, 2011 WL 2461955, at *15 (M.D. Pa. Apr. 28, 2011) report and recommendation adopted, No. 3:10-CV-1019, 2011 WL 2460958 (M.D. Pa. June 17, 2011).

for the misconduct alleged." *Ashcroft*, 556 U.S. at 678, 129 S. Ct. at 1949, 173 L. Ed. 2d at 884, *citing Twombly*, 550 U.S. at 556.    Facts, as opposed to mere conclusions, are required:

> [T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.

*Ashcroft*, 556 U.S. at 678, 129 S. Ct. at 1949, 173 L. Ed. 2d at 884 *citing Twombly*, 550 U.S. at 555.  Complaints in civil rights cases require a higher standard of pleading.  *Randall v. United States*, 95 F.3d 339, 344 (4th Cir. 1996).  A Complaint can survive a motion to dismiss only if it "alleges the specific conduct violating the plaintiff's right, the time and the place of that conduct, and the identity of the responsible officials." *Preast v. McGill*, 65 F. Supp. 2d 395, 403, 65 F. Supp. 2d 395, 403 (S.D. W. Va. 1999) (quotation marks and citation omitted).

Suits against state officials in their official capacities are treated as suits against the State.  *Kentucky v. Graham*, 438 U.S. 159, 166 (1985).  Further, as both Marvin Plumley and Jim Rubenstein, as well as Cliff Goodin as Head Psychologist, are employed in a supervisory capacity, Mr. King must establish the three elements set out in *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1999):

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the

alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw*, 13 F.3d at 799.

Critically, there are no allegations that Marvin Plumley, Jim Rubenstein, or Cliff Goodin had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury. The last two elements are contingent upon the first. In fact, as outlined above, there are no factual allegations contained in the Complaint as to any of these individuals at all.

Mr. King's bald assertions against Marvin Plumley in subsequent pleadings are in direct conflict with the documentation he produced to the District Court for consideration, namely, that Plumley overturned Mr. King's release to general population. This is not accurate as seen in the exhibits produced by Mr. King. (JA 71). Likewise, the Objection was the first time he tied any allegations of Marvin Plumley to his constitutional claims. Additionally, to the extent Mr. King asserts liability against Marvin Plumley for making decisions regarding his confinement conditions, those assertions are contained nowhere in the Complaint.

The first time that Mr. King made any specific reference to Jim Rubenstein was in his Objection to the Report of Magistrate Judge Kaull. Mr. King argues that Defendant Rubenstein oversees training of institutional staff; however, the

46

mere fact that Defendant Rubenstein serves as a supervisor does not subject him to supervisory liability. To the contrary, Mr. King specifically defines "staff" as only including Defendants Rosencrance, Miller, Thompson, Davis, Scott, Gsell, M. Smith, A. Smith, and Doe. (JA 15). All causes of action asserted by Mr. King arise from the conduct of that identified list of "staff." Therefore, claims against these individuals should be dismissed because they fail to satisfy Rule 8 pleading requirements. Accordingly, the District Court did not err in dismissing all claims against Marvin Plumley, Cliff Goodin, and Jim Rubenstein.

Additionally, with respect to any purported individual capacity claims, such claims fail as a matter of law for the additional reasons relied upon above.

## B.    The District Court Did Not Err In Dismissing Mr. King's Claims Against Stacy Scott.

Mr. King did not object to the recommendation that the Court dismiss Stacy Scott. He also did not appeal her dismissal to this Court. Therefore, Mr. King has waived any right to appeal the dismissal of Stacy Scott. Moreover, contrary to Mr. King's Formal Brief, Ms. Scott was dismissed *without* prejudice, and therefore his argument fails as a matter of law. (JA 163).

## (6)    MR. KING DID NOT FILE A MOTION FOR LEAVE TO AMEND THE COMPLAINT, AND, THEREFORE, THIS ISSUE SHOULD NOT BE CONSIDERED ON APPEAL.

Mr. King argues that the District Court erred in not permitting Mr. King leave to amend the Complaint; however Mr. King lost his right to amend the

complaint when the District Court entered final judgment against him at same time that it granted the motion to dismiss. *See, e.g. Foster v. DeLuca*, 545 F.3d 582 (7th Cir. 2008). Once a motion to dismiss has been granted, the District Court need not allow an amendment to a pleading that does not cure defects that led to dismissal of original complaint. *Textor v. Board of Regents of Northern Illinois University*, 711 F.2d 1387 (7th Cir. 1983). This Court has noted that, in cases in which a motion to amend *has* been filed (unlike the case *sub judice* in which no such motion for leave to amend the Complaint has been filed), the District Court properly denied the appellant's motion to amend his complaint, because it was not filed until *after* the District Court dismissed the complaint. *St. John v. Moore*, 135 F.3d 770 (4th Cir. 1998).

All potential claims that Mr. King could have raised based on the facts alleged fail as a matter of law and therefore, an amendment would be futile. Accordingly, there is no basis for this Court to review a hypothetical motion for leave to amend the Complaint because no such motion was ever filed. Thus, because there is nothing on appeal to review in this regard, this request should be denied.

**(7)    THE CORRECTIONS STAFF DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON ALL CLAIMS BECAUSE THEY DID NOT VIOLATE ANY CLEARLY ESTABLISHED LAW.[15]**

Qualified immunity bars § 1983 actions against government officials in their individual capacities. *Brandon v. Holt*, 469 U.S. 464, 472-73, 105 S. Ct. 873, 83 L. Ed. 2d 878 (1985). Because it is an immunity and not merely a defense, it protects government officials not only from liability, but also from the burdens of trial and preparing for trial, so it must be addressed by the court at the earliest possible stage of the litigation. *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991); *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985).

The test for qualified immunity is a two-pronged inquiry: "whether the facts . . . make out a violation of a constitutional right" and whether the right was "clearly established" at the time of the alleged conduct. *West v. Murphy*, 771 F.3d 209, 213 (4th Cir. 2014) *quoting Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). Law is clearly established if "'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what his is doing violates that right.'" *West*, 771 F.3d at 213, *quoting Ashcroft*

---

[15] Though the District Court did not rely on qualified immunity as a basis for its ruling, this Court may "affirm the court's judgment on alternate grounds, if such grounds are apparent from the record." *Cantley v. W. Va. Reg'l. Jail and Corr. Facility Authority*, 771 F.3d 201, 203 (4th Cir. 2014), *quoting Ellis v. La-Pac. Corp.*, 699 F.3d 778, 786 (4th Cir. 2012).

*v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011) (additional citation omitted). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Id.*

In evaluating whether law was clearly established, this Court ordinarily "need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." *West*, 771 F.3d at 213, *quoting Lefemine v. Wideman*, 672 F.3d 292, 298 (4th Cir. 2012) (additional citations omitted).

There is no clearly established law in this Circuit or elsewhere that put the Corrections Staff Defendants on notice that their actions with respect to Mr. King, an inmate who had placed items into his penis and who had been adjudicated guilty of an institutional violation, were unlawful or unreasonable under the circumstances presented. In fact, the constitutional parameters surrounding body modifications such as the penile implants seem to be completely uncharted. This Court has recognized that in analyzing qualified immunity, "we are required to define the right in question 'at a high level of particularity,' and be mindful of the 'specific context of the case.'" *West*, 771 F.3d at 215-16, *quoting Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999) and *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).

In its Fourth Amendment analysis, the District Court discussed *Sanchez v. Pereira-Castillo*, 590 F.3d 31 (1st Cir. 2009), because, like the present matter, that case involved an inmate claim that his Fourth Amendment rights were violated when a surgery was performed on him. As discussed above, the surgical exploration of the prisoner's abdominal cavity in *Sanchez* was conducted for the purpose of determining whether contraband was present, despite the fact that "several tests had indicated the absence of any such object." *Id.*, 590 F.3d at 44.

In stark contrast, the procedure performed on Mr. King was not exploratory. For these and other reasons discussed *supra*, the District Court correctly found that the circumstances alleged by Mr. King are sufficiently dissimilar to those in *Sanchez* to merit a different result. The very fact that the District Court found *Sanchez* to be materially distinguishable demonstrates that Mr. King's position is not clearly established, even in the First Circuit.

*Winston v. Lee*, 470 U.S. 753, 105 S. Ct. 1611, 84 L. Ed. 2d 662 (1985), which also addresses the permissibility of surgical intervention, is even less germane to the present matter. In *Winston*, the State sought to compel a surgery to remove a bullet from the chest of a criminal suspect. The subject of the proposed surgery in *Winston* was not a prisoner but a "citizen-not yet convicted of a criminal offense." *Id.*, 470 U.S. at 765. In *Winston*, the Supreme Court's analysis did not include the question squarely posed by Mr. King's case, specifically, whether the

51

limited Fourth Amendment rights of a prisoner are violated by surgery to remove an object that poses a threat to security in a prison environment. Additionally, the purpose for the surgery in *Winston* was to obtain an object that could be of potential evidentiary value in a criminal matter. *Id.*, 470 U.S. at 758, 105 S. Ct. at 1615. The Supreme Court found that the value of the potential evidence was minimal in light of what appeared to be substantial evidence from other sources. *Id.*, 470 U.S. at 765, 105 S. Ct. at 1619. In contrast, the purpose of the surgery was to remove contraband deemed a threat to prison security.

The only law that appears to be clearly established in this area of Fourth Amendment jurisprudence is that "[t]he reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure." *Winston*, 470 U.S. at 760, 105 S. Ct. at 1616. Case-by-case analysis necessarily involves discretionary decisions. "'Implicit in the idea that officials have some immunity . . . for their acts, is a recognition that they may err' and 'that it is better to risk some error and possible injury from such error than not to decide or act at all.'" *West*, 771 F.3d at 213, *quoting Scheuer v. Rhodes*, 416 U.S. 232, 242, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974), *abrogated in part by Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).

As this Court has recognized, "Courts thus do not penalize officials for 'bad guesses in gray areas." *West*, 771 F.3d at 213*, quoting Braun v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (additional citation omitted). *S.P. v. City of Takoma Park*, Md., 134 F.3d 260, 266 (4th Cir. 1998) (citations omitted); *see also Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir. 1994) (Powell, J.) ("[T]he proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged."). In plain terms, a public official will only be denied qualified immunity if he "appreciate[s] that he was violating" an individual's asserted rights when he takes the action in question. *Johnson v. Caudill*, 475 F.3d 645, 650 (4th Cir. 2007). Moreover, the question of immunity should be decided at "the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (citations omitted). Reasonable officials in the Correction Staff Defendants' position could not have "appreciated that [they were] violating" Mr. King's rights by requesting Mr. King either consent to surgical removal of contraband penile implants or remain in segregation due to the continued security threat. *See Johnson*, 475 F.3d at 650. Because the Fourth Amendment requires a case-by-case analysis, and because in light of existing law the unlawfulness of the Corrections Staff Defendants' actions was not apparent, they are entitled to qualified immunity.

In *Florence* v. *Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 182 L. Ed. 2d 566 (2012), the Court acknowledged that the expectation of privacy is more limited for a general population inmate because security threats are greatest in general population. *Florence* suggests that, where alternatives to placement in general population can be achieved in lieu of an invasive search, such actions are reasonable. S*ee id.*, 132 S. Ct. at 1524 (Alito, J., concurring). Applying *Florence* to this case, Corrections Staff Defendants gave Mr. King the option of remaining separated from general population. This alternative provided Mr. King a means to avoid the surgery that would otherwise be necessary to remove the security threat he created, and further supports the conclusion that the Corrections Staff Defendants' actions were reasonable and did not violate any clearly established law.

With respect to the Eighth Amendment, there is likewise no clearly established law in this Circuit that put the Corrections Staff Defendants on notice that their actions in placing Mr. King in administrative segregation due to the presence of contraband in his penis were unlawful or unreasonable under the circumstances presented.

With respect to the Equal Protection claim, there is no clearly established law in this Circuit that put the Corrections Staff Defendants on notice that their actions in treating Mr. King as an individual, according to the facts and

circumstances, were unlawful or unreasonable under the circumstances presented. In fact, absent any allegation or facts to suggest that Mr. King was a member of a suspect class, the Corrections Staff Defendants met clearly established law because their actions were rationally related to a legitimate state interest, *i.e.* the security, health, and safety of the facility.  Because the unlawfulness of the Corrections Staff Defendants' actions in the circumstances of this case was not apparent, they are entitled to qualified immunity for Mr. King's equal protection claim.

With respect to Mr. King's Due Process claim, Mr. King cannot demonstrate that the particular actions were unlawful under the law established at the time of the incident.   In fact, the law clearly permits officials to make discretionary assessments regarding unwanted, albeit penologically necessary, forced medical treatment.   Therefore, the Corrections Staff Defendants are entitled to qualified immunity on any Due Process claim.

## CONCLUSION

The District Court correctly applied the law in dismissing Mr. King's Complaint.  Upon *de novo* review in this Court, this Court should find that Mr. King has failed to sufficiently state a valid claim for violation of his civil rights under any theory presented as a matter of law.  Accordingly, the relief requested by Mr. King should be denied, and the District Court's dismissal should be affirmed.

Respectfully submitted,

/s/ Natalie C. Schaefer
Natalie C. Schaefer (WVSB 9103)
Kimberly M. Bandy (WVSB 10081)
Shuman, McCuskey & Slicer, PLLC
1411 Virginia Street, East, Suite 200
Charleston, WV 25301
tel. (304) 345-1400
fax (304) 343-1826
nschaefer@shumanlaw.com
kbandy@shumanlaw.com

Counsel for Appellees Jim Rubenstein, Marvin C. Plumley, Dianne R. Miller, Grover Rosencrance, Lester Thompson, Sherri Davis, Mike Smith, Sr., Samantha Gsell, and Adam Smith

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
**Certificate of Compliance with Type-Volume Limitation,**
**Typeface Requirements, and Type Style Requirements**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains <u>13,791</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

Dated: December 14, 2015            /s/ Natalie C. Schaefer
                                    Natalie C. Schaefer (WVSB 9103)

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on December 14, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users:

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Melissa A. Dockery
Melissa A. Dockery
GIBSON MOORE APPELLATE SERVICES, LLC
P.O. Box 1460
Richmond, VA  23218